IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


TAMMY STONE                                                                    PLAINTIFF

v.                                    Civil No. 10-02126


MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                                 DEFENDANT

MEMORANDUM OPINION

## I.      **Factual and Procedural Background**

Plaintiff, Tammy Stone, appeals from the decision of the Commissioner of the Social Security Administration denying her claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(I) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a, respectively (collectively, "the Act").  42 U.S.C. § 405(g).

Plaintiff protectively filed her DIB and SSI applications on June 10, 2008, alleging a disability onset date of December 31, 2006, due to plantar fasciitis, high blood pressure, anxiety and bronchial asthma.  T. 158, 159, 164.  At the time of the onset date, Plaintiff was forty one years old and was a high school graduate.  T. 111, 171.  She had past relevant work as a heavy equipment operator and truck unloader.  T. 165.  Plaintiff's applications were denied at the initial and reconsideration levels.  T. 88, 91, 98, 100.  At Plaintiff's request, an administrative hearing was held in Clarksville, Arkansas, on June 3, 2009, at which Plaintiff and a vocational expert testified.  T. 34-66.  Plaintiff was represented by counsel.  *Id.*  Administrative Law Judge

1

("ALJ") Larry D. Shepherd issued an unfavorable decision on December 2, 2009, finding that Plaintiff was not disabled within the meaning of the Act.  T. 74-83.  On June 24, 2010, the Appeals Council found no basis to reverse the ALJ's decision. T.1. Therefore, the ALJ's December 2, 2009, decision became the Commissioner's final administrative decision.

## II.    <u>Relevant Medical History</u>

On September 11, 2006, Plaintiff went to River Valley Primary Care Services (RVPCS)[1] in Ratcliff, Arkansas, for the purposes of getting medication and establishing a relationship with the clinic, having recently moved to the area.  She claimed to have a history of sinusitis, asthma, migraine headaches, depression and anxiety disorder NOS.  She told examiner Tonya Beineman, APN, that she was coughing and wheezing and that she smoked one half to one pack of cigarettes each day.  She reported sleep disturbances, as well.  Ms. Beineman noted chronic wheezing in Plaintiff's lungs, with normal rhythm and depth.  Plaintiff's mood was empty, frustrated, unhappy and depressed, but her mental status was normal.  Ms. Beineman assessed allergic bronchitis, migraine headache, moderate recurrent major depression and anxiety disorder, NOS.  She gave Plaintiff samples of Proventil MDI (asthma inhaler), Seroquel (anti-depressant) and Zomig (migraine medication) and advised her to return for follow up in one week.  T. 242-243.

On September 18, 2006, Plaintiff returned to RVPCS for follow up, complaining of dizzy spells and nausea from increasing her dosage of Seroquel.  She complained of continued headache and sinus pain, swollen glands, earache, nasal passage blockage, wheezing, restless legs, anxiety, high irritability and sleep disturbances.  She reported no depression or tiredness.  Ms. Beineman noted normal respiration and normal mental status.  She assessed ear infection,

---

[1]"River Valley Primary Care Services is a non-profit Federally Qualified Health Center that provides affordable healthcare for everyone, regardless of ability to pay."  http://www.rvpcs.org/, cite last visited September 6, 2011.

insomnia, allergic rhinitis, migraine headache, restless leg syndrome and bipolar disorder NOS. Ms. Beineman advised Plaintiff to continue her current medications and prescribed Cipro (antibiotic), Trazadone (anti-depressant) and Requip (for restless leg syndrome). Plaintiff was advised to return in ten days. T. 279-281.

On October 3, 2006, Plaintiff returned to RVPCS complaining of earache, cough, chest congestion and dry mouth. She reported that her anxiety symptoms had improved while taking the Seroquil and Trazadone but that she was having sleep disturbances. Ms. Beineman found her respiration and mental status to be normal and assessed ear infection, allergic rhinitis and asthma. She prescribed Proventil, Singulair (treats allergy symptoms and asthma), Amoxicillin and Diflucan (antibiotics), and advised Plaintiff to return for reexamination in two weeks. T. 277-279. Plaintiff returned to the clinic on October 12 and was examined and treated for her ear infection by Naomi Hawkins, APN and John Williams, MD. At this visit Plaintiff reported anxiety and high irritability, but not depression or sleep disturbances. T. 275-276.

On November 28, 2006, Plaintiff returned to RVPCS complaining that her anxiety and stress had gotten worse over the last week and that Seroquel had been working well until the holidays. Ms. Beineman noted Plaintiff was in no acute distress and did not appear depressed. Her mental status was normal. Ms. Beineman assessed Generalized Anxiety Disorder[2] and increased Plaintiff's dosage of Seroquel, advising her to return in one week. T. 274-275.

On December 4, 2006, Plaintiff returned to RVPCS claiming that her mood was better but that she felt tired and wanted to sleep all the time. Ms. Beineman found her to be in no acute distress with normal mental status. She assessed feelings of weakness, acute sinusitis and bipolar

---

[2] The essential feature of Generalized Anxiety Disorder is excessive anxiety and worry occurring more days than not for a period of at least six months, about a number of events or activities. *Diagnostic and Statistical Manual of Mental Disorders* 300.02 (American Psychiatric Association, ed., 4th ed. 2000).

disorder, NOS.   She increased Plaintiff's dosage of Seroquel and prescribed Cipro, Diflucan and Albuterol (asthma), advising Plaintiff to return in one week.  T. 272-274.

On November 12, 2006, Plaintiff returned to RVPCS, reporting no anxiety, depression or sleep disturbances.  Ms. Beineman found her to be in no acute distress with normal mental status. She did note occasional wheezing, but Plaintiff's respiration was normal.  Ms. Beineman assessed sinusitis, asthma with acute exacerbation and bipolar disorder, NOS.  She discontinued Plaintiff's use of Singulair, gave her samples of Allerx PE (antihistamine) and E-mycin (antibiotic) and prescribed Seroquel.  T. 271-272.

On January 22, 2007, Plaintiff returned to RVPCS wanting to talk about her medications. She complained of fatigue, cough, wheezing, and itchy ears.  Plaintiff reported no anxiety, depression, or sleep disturbances.  Ms. Beineman noted normal respiration and mental status. Plaintiff's blood pressure was 162/92.  Ms. Beineman assessed ear infection and essential hypertension.  She prescribed Prednisone and Nystatin-triamcinolone (topical steroids) and Cipro, and ordered lab work.  T. 268-269.

On January 29, 2007, Plaintiff returned to RVPCS to follow up on her lab work.  She said that her allergy symptoms were getting worse after having a new cat in her home for the past few months.   Plaintiff reported feeling tired or poorly and having gained 35 pounds over the past six months.  She suffered from wheezing, dizziness and sleep disturbances.  Her blood pressure was 162/98.  Ms. Beineman recorded that Plaintiff was in no acute distress and her mental status was normal.   She assessed isolated blood pressure elevation, essential hypertension and upper respiratory fungal infection.  Ms. Beineman ordered blood tests and gave Plaintiff samples of and a prescription for Claritin (antihistamine) in addition to steroid injections, advising her to return for reexamination in one week.  T. 266-268.

4

On February 5, 2007, Plaintiff returned to RVPCS. She was no longer dizzy or coughing, but she was still wheezing. She was in no acute distress and her mental status was normal. Her blood pressure was 138/80. Ms. Beineman assessed that her blood pressure was elevated and continued the prescriptions for her current medications, including Hydrochlorothiazide (HCTZ)[3] (high blood pressure). She advised her to return to the clinic in three months. T. 264-266.

On February 15, 2007, Plaintiff returned to RVPCS complaining of multiple joint pains and a rash she noticed while waiting to see Ms. Beineman. She felt the HCTZ was making her arms and legs feel weak, and reported feeling tired or poorly. Plaintiff was wheezing, but in no acute distress with normal respiration and mental status. Ms. Beineman assessed wheezing and educated Plaintiff about a metered dose inhaler for asthma, counseling her to stop smoking. She gave her samples of Lisinopril (blood pressure) and discontinued HCTZ, advising her to return in two weeks. T. 263-264.

On March 3, 2007, Plaintiff returned to RVPCS complaining of a cough and chronic headache in addition to weight gain despite not eating any more or less than before. She reported not feeling tired or poorly. Ms. Beineman recorded that "the patient is definitely improved regarding her bipolar… [and] significantly obese and deconditioned re her weight and asthma." Her respiration was loud and raspy with wheezing heard throughout the lungs. Her mental status was normal and she "appear[ed] to be reasonably stable." Ms. Beineman assessed essential hypertension and bipolar disorder NOS. She advised Plaintiff to return to the clinic if her conditions worsened or new symptoms arose. The chart was also electronically signed by John R. Williams, MD. T. 261-263.

---

[3] The records do not indicate who initially prescribed this medication for Plaintiff or when it was first prescribed.

On May 2, 2007, Plaintiff returned to RVPCS to get refills and talk about her medications. She reported that she had stopped taking Seroquel because it caused her to gain weight. She was feeling a lot of stress, restlessness, nervousness, anxiety with trouble breathing, chest pain or discomfort, rapid heartbeat, excessive sweating, high irritability, hostility, impulsivity, euphoria, hypersensitivity, insomnia, loss of interest in friends and family and lack of energy. She reported having no depression and that while her anxiety interfered with her social activities it did not interfere with her work. Ms. Beineman noted that Plaintiff was in no acute distress and her respiration and mental status were normal. She assessed essential hypertension, asthma and bipolar disorder, manic, with psychotic features. Ms. Beineman prescribed Lisinopril for Plaintiff's high blood pressure and Lamictal for bipolar disorder and advised her to return for reexamination in one to two months. T. 259-261.

On June 11, 2007, Plaintiff returned to RVPCS worried that her blood pressure was high. She had continued smoking one half to one pack of cigarettes a day. She was experiencing anxiety, headaches, palpitations, nausea and dizziness. Her blood pressure was 168/92. She had not taken the Lamictal Ms. Beineman prescribed because she had been unsure of the correct dosage. Plaintiff reported having no depression or high irritability. Dr. Shawn Miller heard wheezing in Plaintiff's chest and noted that her mental status was normal. She diagnosed essential hypertension (poor control) and episodic mood disorders. Dr. Miller counseled Plaintiff to stop smoking, prescribed Lisinopril and Lamictal and advised her to return for reexamination in one month. T. 256-258.

On July 9, 2007, Plaintiff returned to RVPCS to follow up on her blood pressure medication. She also complained of anxiety, insomnia and gastrointestinal reflux disease (GERD). She was feeling tired and coughing and wheezing, but had no depression. She

continued smoking.  She was in no acute distress and her mental status and respiration were normal.  Ms. Beineman assessed essential hypertension (poor control) and generalized anxiety disorder.  She prescribed Diflucan for an infection, Albuterol, Amitriptyline (antidepressant), Ranitidine (ulcers) and advised her to monitor her blood pressure and return for reexamination in two months.  T. 254-255.

On September 10, 2007, Plaintiff returned to RVPCS for medication refills.  She reported anxiety but no depression or sleep disturbance and that she was doing well on Elavil (amitriptyline).   She was experiencing joint pain but her nausea and chest pain were gone.  She was still wheezing and experiencing heart palpitations.  Her blood pressure was 118/80.  Ms. Beineman noted that Plaintiff was in no acute distress and that her respiration and mental status were normal.  She assessed asthma, idiopathic peripheral neuropathy and generalized anxiety disorder and counseled Plaintiff to stop smoking and eat a proper diet.  Ms. Beineman prescribed neo/Polyb/HC (antibiotic for ear itchiness), Atarax hydrochloride (antihistamine/tranquilizer), Combivent (inhaler used to treat chronic obstructive pulmonary disease), Advair Diskus (asthma inhaler), Singulair and Albuterol and advised Plaintiff to return for reexamination in three months.  T. 251-254.

On September 28, 2007, Plaintiff returned to RVPCS complaining of cough and congestion and a hurt hand.  She claimed her asthma inhaler was not helping much and the antihistamine/tranquilizer was not controlling her tremor.  She was still smoking and was not feeling tired or experiencing sinus or chest pain or dizziness.  She reported anxiety but no sleep disturbances.  She was wheezing but her respiration and mental status were normal.  Her blood pressure was 122/80.  Plaintiff told Theodora L. Short, APN, that Amitriptyline was helping with

her headaches.  Ms. Short prescribed antibiotics and pain relievers for Plaintiff's hurt hand and Celexa (antidepressant) for anxiety and advised her to return in two weeks.  T. 249-250.

On December 6, 2007, Plaintiff returned to RVPCS to get medication refills and follow up on her asthma.  She told Michael Guyer, MD, that she was doing well and had no new complaints.  Her respiration and mental status were normal.  Dr. Guyer assessed hypertension, probable asthma and anxiety disorder NOS, and refilled her hydroxyzine hydrochloride, Combivent, amitriptyline, Singluair, Lisinopril, Claritin, and Advair prescriptions.  He gave her a flu shot and advised her to return for reexamination as needed.  T. 248-249.

On March 13, 2008, Plaintiff returned to RVPCS to get refills and reported that she was doing well.  She told Dr. Guyer that her heels had been hurting for the past few months and that she did a lot of standing at her work.  Dr. Guyer examined her feet and found tenderness in both heels but no swelling or inflammation.  He assessed Plaintiff with plantar fasciitis[4] and told her to get shoe supports, lose weight, and limit prolonged periods of standing.  He prescribed pain relievers and advised her to return for reexamination as needed.  T. 246-247.

On May 30, 2008, Plaintiff stopped working her part time job.  On June 10 she filed for Social Security benefits.

On June 11, 2008, Plaintiff returned to RVPCS to get medication refills.  She did not get shoe inserts and reported that her heel pain was not getting better.  She reported continued smoking, coughing up sputum, wheezing and daily use of an asthma inhaler.  Her headaches were improving with Excedrin migraine and amitriptyline, and Zantac was helping her heartburn.  Her blood pressure was 130/86.  Dr. Miller noted that Plaintiff's respiration and mental status

---

[4] Plantar fasciitis involves pain and inflammation of a thick band of tissue, called the plantar fascia, that runs across the bottom of your foot and connects your heel bone to your toes.  Plantar fasciitis is one of the most common causes of heel pain.  http://www.mayoclinic.com/health/plantar-fasciitis/DS00508, site last visited September 7, 2011.

were normal and assessed plantar fasciitis, hypertension, and asthma.  She gave Plaintiff an information sheet about plantar fasciitis, advised her to stop smoking, and refilled her current prescriptions for asthma, heartburn and allergies.  T. 244-146.

On June 12, 2008, Plaintiff filed for Social Security benefits, claiming that she became short of breath, that her feet hurt so much she could hardly walk or stand and that she was unable to do physical work because of her asthma.  T. 164.  In her June 24, 2008, Pain and Other Symptoms report, Plaintiff stated that she had suffered from unusual fatigue since October, 2006 and that she suffered from severe foot pain in booth feet, anxiety attacks, asthma and high blood pressure.  T. 186.

On July 8, 2008, Plaintiff went to Internal Medicine and Associates in Van Buren, Arkansas, to establish care.  Plaintiff told Yvonia Jeannie Finley, MSN, APN, that her feet hurt really bad when she first gets up and after sitting for a long time.  She reported taking one Elavil at bedtime most nights, but needing two some nights to sleep.  Ms. Finley assessed restless leg syndrome, hypertension and plantar fasciitis and prescribed hydrochlorothiazide (high blood pressure) and Doxepin (insomnia).  She told Plaintiff to watch her blood pressure (128/98) and return to the clinic as needed and in two months for a recheck.  T. 300-301.

On July 11, 2008, Dr. Jim Takach undertook a physical residual functional capacity assessment of Plaintiff.  He reviewed her medical records and found a history of mild, well-controlled asthma on outpatient prescription medication, history of hypertension without defined end organ damage, and history of uncomplicated plantar fasciitis receiving conservative treatment.  Dr. Takach found that Plaintiff can occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds.  She can stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday and sit for a total of about six hours.  Her

ability to push and/or pull is unlimited. She is limited to occasionally climbing, balancing and stopping but can frequently kneel, crouch and crawl. She must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. but has no other environmental limitations. Dr. Takach determined that Plaintiff would be limited to light duty work. T. 285-291. At this time, Plaintiff's claims for Social Security benefits were denied.

On August 6, 2008, Plaintiff returned to Internal Medicine and Associates, where Ms. Finley described her as "doing marvelously well" and having good blood pressure (130/76). Plaintiff reported some dementia and not thinking straight, which Ms. Finley attributed to increasing anxiety. Ms. Finley gave Plaintiff an asthma inhaler, increased her Doxepin and added Abilify (one half tablet per day to adjust dopamine and serotonin as an addition to antidepressants). Ms. Finley assessed hypertension, anxiety/depression and "? bipolar". Plaintiff left in no acute distress and was to return in thirty to sixty days. T. 298-299.

On September 11, 2008, Plaintiff underwent a mental diagnostic evaluation performed by Terry L. Efird, Ph.D. Plaintiff told Dr. Efird that she had high anxiety and was "somewhat bipolar". She reported excessive worry and stress about financial matters and "everyday things." She claimed to be easily fatigued, restless, have difficulty concentrating and experienced muscle tension, irritability and sleep disturbance. Plaintiff characterized her mood as "down most of the time" and said she only got three to four hours of sleep a night and did not take naps. Her energy was low due to asthma and she had gained fifty pounds as a result of her medications. Her symptoms had been ongoing for about four years but had become worse over time; she had been "stressing a lot more over the past year." T. 343.

Upon examination, Dr. Efird diagnosed Plaintiff with generalized anxiety disorder and depressive disorder NOS and assigned a GAF[5] score of 50-60.  Although Plaintiff reported being "somewhat bipolar", she denied experiencing extended periods of elevated mood and Dr. Efird did not diagnose her with bipolar disorder.  T. 346.  Plaintiff told Dr. Efird that she could drive unfamiliar routes and shop independently, although she tended to have anxiety attacks around a lot of people and did not shop very long.  She could handle her personal finances satisfactorily and perform most activities of daily living.  She described struggles with asthma and a decreased level of motivation. She described her social interaction as visiting with her sister and a friend on occasion, but tending to primarily stay home.  Dr. Efird found that Plaintiff communicated and interacted in a fairly basic, but reasonably socially adequate manner; communicated in a  fairly basic, but reasonably intelligible and effective manner; has the capacity  to perform basic cognitive tasks required for basic work activities; showed no remarkable problems with attention/concentration, persistence or pace of performance.  T. 356.

On September 23, 2008, Dr. Ronald Crow, an internal medicine specialist, affirmed Dr. Takach's assessment as written.  T. 351.

On September 24, 2008, Dr. Dan Donahue performed a psychiatric review of Plaintiff's affective disorder, anxiety-related disorder and personality disorder.  He determined Plaintiff is moderately restricted in activities of daily living, has moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and has experienced no episodes of decompensation.  T. 370.  He found that Plaintiff is able to perform

---

[5] According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report "the clinician's judgment of the individual's overall level of functioning." GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Manual* at 34. GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

semiskilled work where interpersonal contact is routine but superficial, e.g. grocery checker; complexity of tasks is learned by experience; supervision required is little for routine but detailed for non-routine.  T. 358.  At this time Plaintiff's claims for Social Security benefits were denied on reconsideration.

On October 7, 2009, Plaintiff appealed her August 1, 2008, disability report, claiming increased depression since July, 2008.  T. 223.

On October 8, 2008, Plaintiff returned to Internal Medicine and Associates for a follow-up examination.  She had stopped taking Abilify because she believed it increased her blood pressure.  She reported being shaky and her nerves getting worse; she didn't want to be around people and she was experiencing muscle spasms.  Ms. Finley prescribed Cymbalta (antidepressant) and Inderal (used to treat tremors and high blood pressure) to "take the edge off of things" and added Flexeril (muscle relaxer) for muscle spasms.  Plaintiff was taking Aleve (over the counter non-steroidal anti-inflammatory drug) for other aches and pains.  Ms. Finley assessed chronic obstructive pulmonary disease, bipolar disorder and muscle spasms.  Plaintiff left in no acute distress with instructions to return in one month for a recheck.  T. 386-387.

Also on October 8, Ms. Finley completed a physical residual functional capacity questionnaire.  She reported diagnoses of hypertension, tremors, bipolar disorder, restless leg syndrome, plantar fasciitis and anxiety, symptoms of which included pain in feet, difficulty in breathing, anxiety and depression.  She indicated that "medications may cause drowsiness and dizziness." T. 375.  Ms. Finley stated that Plaintiff was unable to concentrate due to pain in her feet and depression, which would constantly interfere with attention and concentration needed to perform even simple work tasks.  T. 376.  She determined Plaintiff could sit more than two hours at one time before needing to get up and could stand ten to fifteen minutes at a time before

12

needing to sit down or walk around; during an eight hour work day Plaintiff would be able to stand/walk less than two hours and sit about two hours.  Plaintiff would need to take a five minute walk every thirty minutes and shift positions at will from sitting, standing or walking.  T. 377.  Ms. Finley reported that Plaintiff would need to take unscheduled breaks every thirty minutes for five to ten minutes and could rarely lift less than ten pounds and never more.  T. 378. She limited Plaintiff to rarely climbing ladders or stairs and determined that she would have "good days and bad days", missing work more than four days per month.  T. 379.

On October 10, 2008, Plaintiff visited Counseling Associates, Inc. in Clarksville, Arkansas, to talk about "depression issues."  She complained of daily anxiety, panic, depressed mood, mood swings and sleep problems, weekly inattention and morbid preoccupation, and monthly nightmares of being pursued.  Plaintiff told the clinician intern her problem was that "basically…I don't like being around people" and "all I want to do is sleep."  T. 397.  When asked about any major medical conditions or pain she listed asthma, and reported having been diagnosed with bipolar disorder, anxiety and depression.  T. 398.  Plaintiff told the intern that caffeine (she reported drinking a twelve-pack of Mountain Dew daily) may be substantially contributing to her hand tremors, anxiety, sleeping problem, and stomach irritation.  T. 400.  The intern assessed her primary diagnoses to be mood disorder, NOS, with secondary generalized anxiety disorder and polysubstance dependence in full remission.  He recommended individual therapy for anxiety and depressed mood and assessed a GAF score of 55.  T. 402.

On October 20, 2008, Plaintiff returned to RVCPS to get a flu shot, medication refills, and follow up.  She reported that hydrozyzine was not helping with her shakes.  She was coughing but not wheezing and she had no headache or sinus pain.  She had an earache, sore throat and heartburn but no nausea, vomiting or abdominal pain.  She was having no sleep

disturbances and continued to smoke cigarettes.  Dr. Miller assessed hypertension, asthma, migraine headache, and acute upper respiratory infection.  She ordered a metabolic panel to test Plaintiff's calcium, a flu shot, and adjusted Plaintiff's prescriptions, advising her to return in six months.  T. 394-395.

On December 9, 2008, Plaintiff returned to RVCPS complaining of a sore throat that started that morning.  Dr. Guyer noted that her respiration was normal and assessed pharyngitis (inflammation of the back of the throat).  He prescribed an antibiotic, Tylenol and Chloraseptic throat spray and advised Plaintiff to stop smoking and return to the clinic as needed.  T. 391-392.

On January 8, 2009, Plaintiff returned to Internal Medicine & Associates needing an inhaler, "something for GERD" and wanting to lose weight.  Ms. Finley assessed GERD, anxiety/depression, and muscle spasms; she prescribed Prilosec to prevent the production of acid, Inderal for tremors, Flexeril for muscle spasms and gave her samples of Cymbalta, advising Plaintiff  to return as needed and for her regular follow up appointment.  Ms. Finley noted on the chart that Plaintiff's lower left and right feet were improved.  T. 384-385.

On April 15, 2009, Plaintiff returned to Internal Medicine & Associates for refills.  She thought her insomnia medication needed to be increased, as well.  She reported having trouble losing weight, but that Cymbalta was working well for her.  Ms. Finley assessed hypertension (and noted plaintiff's "B/p doing good"), bipolar/anxiety/depression, weight issues and muscle spasms.  She refilled Plaintiff's prescriptions and added Tenuate for weight loss, advising her to return after having lab work done at the charity clinic in Ratcliff.  T. 381-382.

On April 22, 2009, Plaintiff returned to RVPCS for refills on her inhalers and to have blood drawn.  Dr. Miller noted faint wheezing in Plaintiff's lungs but that her respiration was

normal.  She assessed hypertension, prescribed inhalers and Singulair for asthma and advised Plaintiff to return in three months for reexamination.  T. 389-380.

On October 19, 2009, Plaintiff returned to RVPCS for prescription refills and concern about recent weight gain.  She told Dr. Miller that because of the cost, she was only taking her asthma medication regularly and trying to save her blood pressure medicine, but she continued to smoke every day.  Dr. Miller assessed hypertension and asthma and prescribed asthma medications, adding Symbicort to her regimen.  Dr. Miller also instructed her to get an HIV test. T. 404-405.

## III.   **Applicable Law**

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion."  *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it.  *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)).  If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed.  *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable

physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the Residual Functional Capacity ("RFC") to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform given his age, education and work experience.  *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a).  If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled.  *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

**IV.**   **Discussion**

The ALJ determined that the claimant met the insured status requirements through December 31, 2011, that she had not engaged in substantial gainful activity since December 31, 2006, and that she had severe impairments of plantar fasciitis, hypertension, asthma and mood disorder.  T. 76.  The ALJ found, however, that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR § 404, Subpart P, Appendix 1.  T. 77.   The ALJ further found that Plaintiff's allegations regarding her limitations were not fully credible, and that the Plaintiff retained the residual functional capacity to perform unskilled, sedentary work with limitations.  T. 78.

Plaintiff filed this claim contending that the ALJ: failed to properly develop the evidence, failed to consider evidence which fairly detracted from his findings, failed to apply proper legal standards, and failed to satisfy the burden of proof at the fifth step of the Sequential Evaluation Process.  Pl.'s Br. at 7, 9, 10, 15.

**A.**     **Substantial Evidence Supports the ALJ's RFC Assessment**

A claimant's RFC is the most she can do despite her limitations.   20 C.F.R. § 404.1545(a)(1).   The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).  The Court notes that Plaintiff appears to place the burden of proof on the Commissioner.   It is the claimant, however, who bears the burden of proving her physical restrictions and/or residual functional capacity.  See *Geoff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005).

The ALJ found that Plaintiff has the residual functional capacity to lift and carry ten pounds occasionally and less than ten pounds frequently, sit for about six hours during an eight hour workday, and stand and walk for at least two hours during an eight hour workday.  She can occasionally climb, balance, stoop, kneel, crouch, and crawl and must avoid concentrated exposure to dusts, fumes, gases, odors and poor ventilation.  She can understand, remember and

carry out simple, routine, and repetitive tasks, and can have occasional contact with co-workers and the general public. T. 78.

The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000). This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. See 20 C.F.R. § 404.1512. The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press her case. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). However, the ALJ is not required **to** function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. See *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial").

In developing the record, the Commissioner is required to obtain additional medical examinations and/or testing only if the record does not provide sufficient medical evidence to determine whether the claimant is disabled. See *Barrett v. Shalala*, 38 F.3d 1019 (8th Cir. 1994)(citing, in part, 20 C.F.R. 404.1519a(b)). *See also Dozier v. Heckler*, 754 F.2d 274(8th Cir. 1985)(reversible error not to order consultative examination when such evaluation is necessary to make informed decision). 20 C.F.R. 404.1519a(b) identifies several instances in which additional medical examinations and/or testing is warranted. They include the following: (1) where the additional evidence needed is not contained in the records of the claimant's medical sources; or (2) where a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved and the Commissioner is unable to do so by re-contacting the medical sources.

In this case the ALJ had available to him reports of treating professionals going back to 2006, including twenty three visits to River Valley Primary Care Services before the ALJ hearing. The Agency ordered a consultative examination specifically to develop the record regarding Plaintiff's impairments. T. 343-347. The ALJ also had the opinion of three state agency medical specialists, Plaintiff's written statements to the Social Security Administration and her testimony from the hearing.

Plaintiff complains that because the ALJ pointed out an inconsistency[6] in Ms. Finley's medical treatment records, he was required to re-contact Ms. Finley for clarification before "throwing out" her responses to a physical residual functional capacity questionnaire. Pl.'s Br. at 8. The ALJ's determination was with regard to the amount of weight to be given to Ms. Finley's opinion evidence, (*see* discussion *infra*) not to the existence of any undeveloped, "crucial issues." *See Id.* Plaintiff has failed to establish that the medical records presented did not provide sufficient medical evidence to determine the nature and extent of Plaintiff's limitations and impairments. Further, Plaintiff has failed to show she was in anyway prejudiced or treated unfairly by the ALJ if the record was not in fact fully and fairly developed. The Court finds the ALJ satisfied his duty to fully and fairly develop the record in this matter.

The record provides substantial evidence to support the ALJ's RFC that Plaintiff can perform less than a full range of sedentary, unskilled work. Medical records from River Valley Primary Care Services show a history of asthma, high blood pressure and depression/anxiety for which Plaintiff was provided care and treatment since at least September of 2006. Beginning in March of 2008 she was also treated for and advised about the pain in her feet from plantar fasciitis. The ALJ specifically considered each of Plaintiff's alleged impairments and symptoms:

---

[6] "For example, although nurse Finley found that the claimant can sit no more than about two hours per day, she wrote in an August 6, 2008, treatment note that the claimant was 'doing marvelously well.' On April 15, 2009, she wrote that the Cymbalta '…seems to be working well for her….'" T. 81.

> The claimant alleged depression and anxiety, bronchial asthma, high blood pressure, and plantar fasciitis.  The claimant reported that she experiences the following symptoms; shortness of breath, easy fatigability, foot pain, anhedonia, and self- isolation/social withdrawal.  The claimant asserted that her impairments, and related symptoms, result in functional restrictions and difficulties with activities of daily living….she asserted that she cannot walk or stand very long as a result of foot pain and that she cannot do much physical work as a result of asthma-related shortness of breath….she has to avoid cleaning chemicals; cannot be in extreme climate conditions; cannot be around dust; and cannot sweep or vacuum carpets.  T. 78-79.

The ALJ separately discussed Plaintiff's impairments and subjective complaints, stating that he considered "all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p."  T. 78.  He further stated that after "careful consideration of all of the evidence," he found that Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms she alleged.  *Id.*

The ALJ's RFC is consistent with the medical evidence, which shows a history of mild, well-controlled asthma, high blood pressure that was "doing marvelously well" and uncomplicated plantar fasciitis warranting conservative treatment.   On numerous occasions Plaintiff reported that her medications were relieving or diminishing her symptoms.   On September 18, 2006, Plaintiff reported that she was experiencing no depression.  T. 280.  On October 3, 2006, she told Ms. Beineman that Seroquel and Trazadone were helping her insomnia.  T. 278.  On December 12, 2006, Plaintiff was experiencing no anxiety, depression or sleep disturbance.  T. 271.  On March 5, 2007, Plaintiff reported being "definitely improved" regarding her bipolar disorder.  T. 261.  On May 2, 2007, Plaintiff reported no depression and told Dr. Miller that anxiety did not interfere with her ability to work.  T. 259.  On September 28, 2007, and June 11, 2008, Plaintiff reported that the medications were helping her

headaches.  T. 250, 244.  On December 6, 2007, and March 13, 2008, Plaintiff reported "doing well."  T. 248, 246.  At each assessment at River Valley Primary Care Services her respiration and mental status were normal.  "If impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Brown v. Barnhart,* 390 F.3d 535, 540 (8th Cir. 2004), quoting *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).  Dr. Guyer told Plaintiff to limit prolonged periods of standing at work to ease her foot pain, but other than that no physician placed any restrictions on her activities.  T. 246-247.  Doctors Takach and Crow each determined Plaintiff was able to perform light duty, but the ALJ found that the treating source data was more consistent with an exertional limitation to sedentary work.  The ALJ took Plaintiff's foot pain into consideration in limiting her to standing and walking less than two hours a day.

Although Plaintiff reported to Dr. Efird high anxiety, worry, restlessness and stress, his consultative examination also revealed that she could drive unfamiliar routes, shop independently, handle personal finances, perform most activities of daily life satisfactorily and interact with family and friends.  T. 346.  Dr. Efird found Plaintiff's communication and interaction to be reasonably socially adequate, intelligible and effective.  She displayed the capacity to perform basic cognitive tasks required for basic work like activities.  She appeared able to track and respond adequately at the examination and showed no remarkable problems with attention or concentration during the evaluation.  She completed most tasks within an adequate time frame and showed no remarkable problems with mental pace of performance.  Dr. Efird determined her symptoms were consistent with diagnoses of generalized anxiety disorder and depressive disorder, NOS, but that she did not experience extended periods of elevated mood required for a diagnosis of bipolar disorder.  T. 345-346.  Social Security Medical

Consultant Dr. Donahue found only a few areas in which Plaintiff was "moderately limited," those being the ability to maintain attention and concentration for extended periods, the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and the ability to set realistic goals or make plans independently of others.  He found that she was not significantly limited in any of the other categories of mental functional capacity.  T. 358.  Dr. Donahue found Plaintiff to be only moderately limited in performing activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace.  T. 370.  These findings are consistent with her medical records of treatment for anxiety, depression, insomnia and self-isolation.

In this case, the ALJ did not find that Plaintiff's impairments had no effect on her ability to work.  Instead, he concluded, based on the medical records and testimony, that Plaintiff could only perform unskilled,   sedentary work and that her mental impairments require a work setting in which she is only required to understand, remember and carry out simple, routine and repetitive tasks and to have only occasional contact with co-workers and the general public.  T. 78.  As discussed above, there is substantial evidence in the record to support the ALJ's conclusion.

As part of the determination of RFC, after reviewing the medical records, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.  T. 78.  An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully

support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1332 (8th Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.  *See Id.*   The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).  However, the ALJ need not explicitly discuss each *Polaski* factor.  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*  The issue is not whether Plaintiff suffers from any pain, but whether her pain is so disabling as to prevent the performance of any type of work.  *McGinnis v. Chater*, 74 F.3d 873, 874 (8th Cir. 1996).  In *Polaski,* the Eighth Circuit set forth the following pain standard:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.  739 F.2d at 1322.

Questions of credibility are the province of the ALJ as trier of fact in the first instance.  *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995).  The ALJ need not discuss every *Polaski* factor if he discredits Plaintiff's credibility and gives good reason for doing so.  If the ALJ gives good reasons for finding Plaintiff not credible, then the court should defer to his judgment when every factor is not explicitly discussed.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

The ALJ recognized the prevailing legal standard in considering Plaintiff's subjective complaints; specifically, the ALJ cited Social Security Rule 96-7p and took into account the *Polaski* factors.  T. 78.   The ALJ's credibility analysis was proper.  He made express credibility findings and gave multiple valid reasons for discrediting Plaintiff's subjective complaints.  Plaintiff's own reports concerning her daily activities undermine her claim of disability.  The ALJ specifically noted that while Plaintiff reported in her pain questionnaire that she is able to walk only five minutes as a result of asthma, she indicated in her function report that she cooks and does laundry for her husband.  She prepares simple meals daily and performs light cleaning tasks in addition to laundry.  She cares for a pet and for her own personal needs, goes outside daily, drives and shops in stores for thirty minutes to an hour.    T. 79.   While Plaintiff testified that her feet throbbed and it felt like walking on rocks, as recently as October 10, 2008, she reported to her counselor at Counseling Associates, Inc. that the only medical condition or pain management concern she had was asthma.  T. 42, 398.   The ALJ also noted that while Plaintiff reported withdrawal and social isolation, she stated that she talks with her sisters two days a week.  Plaintiff continued to work part time at a diner until May 30, 2008, seventeen months after her alleged disability onset date.  Her story on that job varied; she told her counselor that she had been unable to work since 2006 because of her asthma, but she told the Social Security Agency and Dr. Efird that she left because the business closed.  T. 397, 344, 164.   Finally, Plaintiff told her counselor that she believed the twelve pack of Mountain Dew she drank every day could be significantly contributing to the hand tremors, anxiety, sleeping problems, and stomach irritation she was experiencing.   There is substantial evidence to support the ALJ's finding that her activities do not suggest significant physical or mental restrictions.

Plaintiff testified that her high blood pressure was controlled my medication.  T. 49.  She did not get the shoe inserts that Dr. Guyer advised to relieve her foot pain.  T. 244, 247.  Despite numerous complaints of coughing, wheezing, and upper respiratory infections, Plaintiff continued to smoke cigarettes daily, significantly contributing to her asthma symptoms.  Doctors and nurses told her to stop smoking on several occasions, but she continued, testifying that although she knows what it does to her health, it is "[her] drug to remain…calm."  T. 57-58.  There is no dispute that smoking has a direct impact on Plaintiff's lung impairments.  Failure to follow prescribed treatment may be grounds for denying an application for benefits.  *"Kisling v. Chater*, 105 F.3d 1255, 1257 (9th Cir. 1997).  Plaintiff testified that her medications make her sleepy, make her heart beat "real quick" and give her dry mouth, but she told Dr. Efird that she experienced no side effects from her prescribed medication.  T. 45, 344.   Review of the ALJ's decision, in light of the entire administrative record, shows that there were inconsistencies between Plaintiff's allegations of pain and the evidence as a whole.  *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011).  As a result, the ALJ did not err in evaluating Plaintiff's credibility.

For these reasons, the court finds that the ALJ's treatment of Plaintiff's subjective complaints conforms to the requirements of *Polaski*.  The ALJ's findings are supported by substantial evidence on the record as a whole.

Plaintiff alleges that the ALJ erred in giving little weight to the opinion of Ms. Finley and great weight to the opinions of non-treating physicians and psychologists Dr. Donahue, Dr. Takach and Dr. Crow.  Pl.'s Br. at 12-13.  On October 8, 2008, Ms. Finley had completed a physical residual functional capacity questionnaire indicating that Plaintiff was incapable of even "low stress" jobs because she was unable to concentrate due to pain in her feet and depression.  T. 376.  Plaintiff claims that the ALJ was required to give great weight to Ms. Finley as a

"treating source" and that he substituted the opinions of sources "who may not even have medical backgrounds for that of a treating doctor."  P.'s Br. at 14.

Ms. Finley is an Advanced Practice Nurse, not a licensed physician, despite Plaintiff's contentions to the contrary. In both her prehearing memorandum and in her brief to this Court, Plaintiff referred to Ms. Finley as a doctor.  T. 234; Pl.'s Br. 9, 14.  Nonetheless, the Court chooses to view these as editorial mistakes rather than an intentional attempt to mislead the Court.  That being said, while Ms. Finley is not an "acceptable medical source" for purposes of 20 C.F.R. § 404.1513(a) (setting out medical and other evidence of impairments), her opinion is relevant as an "other medical source."  *Id.* at (d)(1).  "In addition to evidence from the acceptable medical sources listed ... we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to-(1) Medical sources not listed ... *nurse-practitioners ...and therapists.*" *Id.* (emphasis added). As a nurse-practitioner, Ms. Finley fits the criteria of "other" medical sources, which are appropriate sources of evidence regarding the severity of a claimant's impairment, and the effect of the impairment on a claimant's ability to work. *Id; see Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003).

The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors.  Generally, more weight is given opinions of sources who have treated a claimant, and to those who are treating sources.  20 C.F.R. § 1527(d).  The regulations provide that the longer and more frequent the contact between the treating source, the greater the weight will be given the opinions.  "When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the

source's opinion more weight than we would give it if it were from a nontreating source." *Id.* at (d)(2)(i). A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record. *Id.* at (d)(2). Where controlling weight is not given to a treating source's opinion, it is weighed according to the factors enumerated above. *Id*      Ms. Finley saw Plaintiff on three occasions (July 8, 2008, August 6, 2008, and October 8, 2008) prior to completing the physical residual functional capacity questionnaire.   Compared to the twenty three examinations and assessments provided by nurses and physicians at River Valley Primary Care Services covering the period from September 2006 – April, 2009, this by no means represents the "longitudinal treatment history" with Plaintiff that she proclaims it to be.  Pl.'s Br. at 5.   Furthermore, there is nothing in Ms. Finley's treatment notes to justify the extreme restrictions she placed upon the Plaintiff.   Plaintiff began and ended each of her three appointments with Ms. Finley in no acute distress; she received no laboratory diagnostic testing and was described by Ms. Finley as "doing marvelously well".  T. 298, 300, 384.  Ms. Finley's opinion that Plaintiff was incapable of any work at all is not only inconsistent with her own treatment records, but with the records of the providers who treated Plaintiff regularly for over two years.  Those are the records that Dr. Crow, Dr. Donahue, and Dr. Takach based their opinions on and they are entitled to great weight.

   Finally, the Court notes that State agency medical or psychological consultants and other program physicians, psychologists and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians,

psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether a person is disabled.  *See* 20 C.F.R. §1527(f).

The ALJ did not err in assigning little weight to Ms. Finley's residual functional capacity conclusions.

**B.     Substantial Evidence Supports the ALJ's Determination That Plaintiff Can Perform Other Work That Exists in Significant Numbers in the National Economy.**

After finding that Plaintiff was unable to perform her past relevant work, the ALJ properly relied on vocational expert testimony to determine whether Plaintiff can perform other work available in the national economy.  T. 82.  *See* 20 C.F.R. §§ 404.1566(e), 416.966(e) (In determining disability, the Agency may use vocational expert testimony to determine whether a claimant can perform other occupations). The ALJ asked the vocational expert the following hypothetical question:

> Please assume a younger individual with a high school education who can lift and carry 20 pounds occasionally, 10 pounds frequently.  Individual can sit for about 6 hours during an 8 hour work day, can stand and walk for about 6 hours during an 8 hour work day.  Individual can occasionally climb, balance, stoop, kneel, crouch, and crawl.  Individual is to avoid concentrated exposure to fumes, dust, gases, odor, poor ventilation.  Individual can understand, carry out, and remember simple routine and repetitive tasks.  Individual can have occasional contact with coworkers and the general public.  Based on my hypothetical, would there be jobs available?  T. 61-62.

The Vocational Expert responded that the hypothetical individual would be able to work in three light duty, unskilled occupations:  Office Helper (of which there are 200 jobs in Arkansas and 7400 in the U.S.), School Bus Monitor (of which there are 130 jobs in Arkansas

and 16,000 in the U.S.) and Inspector, Hand Packager (of which there are 350 jobs in Arkansas

and 11,000 in the U.S.).  T. 62-63.

The ALJ then proposed a second hypothetical question:

Please assume a younger individual with a high school education who can lift
and carry 10 pounds occasionally, less than 10 pounds frequently.  Individual can
sit for about 6 hours in an 8 hour workday, can stand and walk for at least 2
hours during an 8 hour work day.  Individual can occasionally climb, balance,
stoop, kneel, crouch and crawl.  Individual is to avoid concentrated exposure to
fumes, dust, gases, odors, and poor ventilation.  Individual can carry out,
understand, and remember simple routine and repetitive tasks.  Individual can
have occasional contact with coworkers and general public.    Based on that
hypothetical, would there be jobs available?  T. 63-64.

The Vocational Expert identified four sedentary, unskilled occupations that could be

performed with these restrictions:  Cutter and Paster, press clippings (of which there are 300

jobs in Arkansas and 331,000 in the U.S.), Microfilm Document Repairer (of which there are

100 jobs in Arkansas and 2000 jobs in the U.S.), Trimmer (of which there are 200 jobs in

Arkansas and 15,000 in the U.S.) and Vehicle Escort Driver (of which there are 250 jobs in

Arkansas and 26,000 jobs in the U.S.).  T. 64-65.

The ALJ proposed a third hypothetical question:

If  I add to either of my hypotheticals that the individual could sit, stand, walk for
a combined total of less than 8 hours during an 8 hour work day, or would be
required to take frequent unscheduled breaks in excess of normal allotted breaks,
or would miss two or more days of work per month due to her impairments, or
would be off task up to one third of the day, how would each of those additional
factors individually affect the jobs that you identified as well as all other jobs?  T.
65.

The Vocational Expert testified that those limitations would erode the job base to zero.

T. 65.

The ALJ's RFC determination indicates that his decision was based upon the second of

his three hypothetical questions.  The hypothetical question posed by the ALJ in this case

incorporated each of the impairments that the ALJ found to be credible, and excluded those impairments that were discredited or that were not supported by the evidence presented (as discussed *supra*).  The Eighth Circuit has held that "an ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when '[t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities;" or "when the record does not support the claimant's contention that his impairments 'significantly restricted his ability to perform gainful employment.'"  *Owen v.* Astrue, 551 F.3d 792, 801-802 (8th Cir. 2008)(quoting *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994).   Accordingly, the ALJ's determination that Plaintiff could still perform work that exists in significant numbers in the national economy is supported by substantial evidence.

**V.**   **Conclusion**

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed.   Accordingly, Plaintiff's complaint should be dismissed with prejudice.

ENTERED this  day of September 15th, 2011.

/s/  *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE